Ross C. Anderson (#0109)
LAW OFFICES OF ROCKY ANDERSON
The Judge Building
Eight East Broadway, Suite 450
Salt Lake City, Utah 84111
Telephone: (801) 349-1690
Fax: (801) 349-1682
rocky@andersonlawoffices.org

*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CALVIN DONALD OSTLER, individually and as personal representative of the Estate of Lisa Marie Ostler, KIM OSTLER, and the minor children of Lisa Marie Ostler through their adoptive parents and next friends, CALVIN DONALD OSTLER and KIM OSTLER, <br><br> Plaintiffs, <br><br> vs. <br><br> HOLLY PATRICE HARRIS, ZACHARY PAUL FREDRICKSON, TODD ALLAN BOOTH, TODD RANDALL WILCOX, M.D., RONALD PAUL ROUBIDOUX, COLBY GREY JAMES, BRENT LEE TUCKER, JAMES M. WINDER, PAM LOFGREEN, JOHN DOE, whose true name is unknown, and SALT LAKE COUNTY, a political subdivision of the State of Utah, <br><br> Defendants. | **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br><br> Case No. 2:18-cv-00254-001 <br><br> Judge Bruce S. Jenkins |

Plaintiffs complain of Defendants and, demanding trial by jury, allege as follows:

## PARTIES

1.     Plaintiff Calvin Donald Ostler ("Cal") is a citizen and resident of the State of Utah; he is the surviving father of Lisa Marie Ostler ("Lisa"), deceased; he is the personal representative of the estate of Lisa; and he is the adoptive father and next friend of the three surviving minor children of Lisa, C.K., E.L.K., and L.M.O.

2.     Plaintiff Kim Ostler ("Kim") is a citizen and resident of the State of Utah; she is the surviving mother of Lisa Marie Ostler, deceased; and she is the adoptive mother and next friend of the three surviving minor children described in Paragraph 1 above.

3.     C.K. is a citizen and resident of the State of Utah and is the surviving fourteen-year-old son of Lisa Marie Ostler, deceased.

4.     E.L.K. is a citizen and resident of the State of Utah and is the surviving twelve-year-old daughter of Lisa Marie Ostler, deceased.

5.     L.M.O. is a citizen and resident of the State of Utah and is the surviving seven-year-old daughter of Lisa Marie Ostler, deceased.

6.     Defendants Holly Patrice Harris ("Harris"), Zachary Paul Fredrickson ("Fredrickson"), and Todd Allan Booth ("Booth") (collectively "Guard Defendants") are citizens and residents of the State of Utah and at all times material

hereto were officers, agents, or employees of Salt Lake County, assigned to work at the Salt Lake County Metro Jail.

7.     Defendant James M. Winder ("Winder") is a citizen and resident of the State of Utah and at all times material hereto was the Salt Lake County Sheriff, the highest supervisory person in charge of the Salt Lake County Metro Jail.

8.     Defendant Pam Lofgreen ("Lofgreen") is a citizen and resident of the State of Utah and at all times material hereto was the Salt Lake County Sheriff's Office Chief Deputy and Commander of the Salt Lake County Metro Jail, in charge of setting and implementing the policies and procedures for, and providing supervision over, the Salt Lake County Metro Jail.

9.     Defendant Todd Randall Wilcox, M.D. ("Wilcox"), is a citizen and resident of the State of Utah and at all times material hereto was the Medical Director of the Salt Lake County Metro Jail in Salt Lake County, Utah. As such, he is and was responsible for the training and supervision of all medical personnel and for the formulation, adoption, execution, implementation, and enforcement of all policies, procedures, and officially sanctioned customs relating to the provision of medical care at the Salt Lake County Metro Jail. Wilcox also is shown in the records of the Salt Lake County Metro Jail to be Lisa's admitting physician.

10.     Defendants Ronald Paul Roubidoux ("Roubidoux"), Colby Grey James ("James"), Brent Lee Tucker ("Tucker"), and John Doe, whose name and address of residence is unknown at this time, (collectively "Nurse Defendants") are citizens and residents of the State of Utah and at all times material hereto were registered nurses working at the Salt Lake County Metro Jail and employed by Salt Lake County.

11.     Defendant Salt Lake County, a political subdivision of the State of Utah, maintains the Salt Lake County Metro Jail and is responsible for the implementation and establishment of policies and procedures, customs, and the supervision and training of officers, agents, and employees assigned to work at the Salt Lake County Metro Jail.

## JURISDICTION AND VENUE

12.     This action arises under the United States Constitution, particularly the provisions of the Fifth and Fourteenth Amendments, 42 U.S.C. § 1983, and the Utah State Constitution, particularly Article I, Sections 7 and 9.

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

14.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the conduct complained of herein took place in Salt Lake County, Utah.

15.    The acts of the Defendants described herein to be in violation of 42 U.S.C. § 1983 and the United States Constitution were undertaken by the Defendants and each of them under color of state law, particularly the statutes, ordinances, regulations, policies, customs, practices, and usages of, and under the authority of, Defendant Salt Lake County, and the individual offices of Defendants as officers, agents, and/or employees of Defendant Salt Lake County.

16.    Jurisdiction for violations of the Utah Constitution is founded upon supplemental jurisdiction because the claims of violations of federal law are substantial and the supplemental claims derive from a common nucleus of operative facts and are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

17.    Under protest, and vigorously asserting the inapplicability or the unconstitutionality of the Bond and Undertaking Requirements of Utah Code Ann. §§ 78B-3-104 and 63G-7-601, under the Due Process, Petition, and Equal Protection guarantees of the United States and Utah Constitutions, as well as the Open Courts Clause of the Utah Constitution, Plaintiffs have deposited with the Clerk of the Court $600 ($300 for the Bond and $300 for the Undertaking) and filed with the Court a Bond and Undertaking, pursuant to DUCivR 67-1(c).

## FIRST CLAIM FOR RELIEF
### (Survival and Wrongful Death Actions Under 42 U.S.C. § 1983)

For their First Claim for Relief, Plaintiffs complain against the Defendants and allege as follows:

18.     Lisa, a pretrial detainee who was entitled to be free from punishment, and who was entitled to medical treatment for her severe, life-threatening medical condition, under (1) the Due Process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, (2) the Due Process clause of Article I, Section 7 of the Utah Constitution, and (3) the prohibition against the treatment of persons arrested or imprisoned with unnecessary rigor, under Article I, Section 9 of the Utah Constitution, was held in, and under the care and supervision of, the Salt Lake County Metro Jail and the Defendants from March 29, 2016, until April 2, 2016.

19.     During April 1 and April 2, 2016, when Lisa was held in Pod C, Section 8 ("8C"), cell 16 of the Salt Lake County Metro Jail, Lisa exhibited obvious signs of excruciating pain from life-threatening peritonitis, was unable and failed to eat or drink anything since, at the latest, the morning of March 31, 2016,  and experienced obvious and life-threatening dehydration. Lisa, as well as other detainees, repeatedly pleaded for medical help for Lisa. Those pleas for help, and Lisa's signs of life-threatening medical need, which were so obvious that even a lay person would easily

recognize the necessity for a doctor's attention, were outrageously ignored and cruelly dismissed by the Nurse Defendants and the Guard Defendants, leading to the utter failure by such Defendants to obtain, provide, or arrange for monitoring, evaluation, medical diagnosis, or medical treatment for Lisa, ultimately leading to Lisa's untimely, horrifyingly painful, and wholly unnecessary death.

20.     As a result of the deliberate indifference of the Defendants, Lisa was found in her cell unresponsive, without a pulse and not breathing, on April 2, 2016, and she died on April 3, 2016, when it was determined at a hospital that there was no longer any sign of a heartbeat and Lisa was pronounced dead. The Guard Defendants and Nurse Defendants engaged in abuse and treatment of Lisa that was needlessly harsh, degrading, and dehumanizing.

21.     On March 30, 2016, an employee or agent of Salt Lake County Jail completed a "Comprehensive Nurse Examination" form about Lisa, providing a "Health and Mental Health Rating" of "Level 3", noting "multiple medical issues", noting a history of gastric bypass surgery, and confirming that Lisa was "instructed on proper procedure to access medical, dental or mental health care through sick call request process." Also on March 30, 2016, an employee or agent of Salt Lake County completed a "Medication Verification Worksheet" noting that Lisa reported taking multiple medications, including Pentasa, for Crohn's disease.

22.    On March 31, 2016, while being held in Pod C, Section 5 ("5C") of the Salt Lake County Metro Jail, after not eating when breakfast was made available around 6 a.m. and not eating when lunch was made available around noon, Lisa presented to an employee of the Salt Lake County Metro Jail with obvious signs of extreme confusion, asking where "Claudia" was because they were going to go to a wedding together.  That incident was noted in the records of the Salt Lake County Metro Jail, as was a recommendation for follow-up, which were available to the Guard Defendants and the Nurse Defendants, yet were wholly ignored by those Defendants.

23.    On April 1, 2016, Lisa was moved from 5C to 8C of the Salt Lake County Metro Jail. Since at least the previous morning, March 31, until Lisa was found in her cell unresponsive and not breathing on April 2, she did not eat anything, a fact well known to the Guard Defendants and the Nurse Defendants. In fact, Defendant Tucker was expressly notified by Defendant Fredrickson that Lisa had not eaten for two days, yet Tucker wholly failed to determine how long it had been since Lisa had last eaten anything and casually and dismissively stated that there was no concern until someone had not eaten for seventy-two hours. Defendant Tucker made that assessment without ever examining, monitoring, evaluating, diagnosing, or providing medical treatment for Lisa, or arranging for a competent medical

professional to examine, monitor, evaluate, diagnose, or provide medical care for Lisa.

24.     At about 3:25 p.m. on April 1, 2016, Defendant Roubidoux was informed by Lisa that she was experiencing severe pain, which Lisa's bearing and expressions confirmed. By then, as with anyone suffering from untreated peritonitis, Lisa was in excruciating pain, signifying that she was suffering from a serious medical condition. Roubidoux did not check Lisa's blood pressure, pulse, or temperature, he did not palpate her abdomen, and he did not chart anything regarding any semblance of a medical examination, which he failed to perform. Roubidoux also wholly failed to arrange for a medical examination, evaluation, or treatment by a medical professional competent to examine, evaluate, and treat Lisa and, with complete indifference to her obviously serious medical condition, simply "cleared her to stay in the unit."

25.     On April 1, 2016, after detainees were locked down at approximately 4 p.m. to eat dinner, Lisa was heard by other inmates, even some on a different tier and several cells down from Lisa's, yelling and moaning, obviously in excruciating pain and obviously in need of immediate medical attention. One inmate has described what she heard from Lisa as being "like a deathly holler," a "growl," and "horrific." At that time, Defendant Booth was at the control desk and heard Lisa

calling out in pain and for help, yet he did nothing to help her or to cause anyone else to help her, in utter disregard for Lisa's pain and obviously serious, life-threatening medical condition, which would have been, and was, obvious to any layperson, as was the requirement that Lisa be provided immediate medical attention.

26.    For reasons presently unknown to Plaintiffs, Lisa had been "on lock-down," locked in her cell alone since she arrived at 8C, while every other detainee in 8C was free to walk around and talk to other detainees and officers, other than during lockdowns for meals, sleep, and certain urgent matters. Lisa was essentially left, locked up alone, to withdraw from drugs, which withdrawal itself would have been a serious medical condition, requiring medical observation and checking of vital signs, none of which was provided by any of the Defendants.

27.    The Guard Defendants and Nurse Defendants all knew Lisa had not eaten for several days, that she was in horrific pain, that she was not free to walk outside of her cell (notwithstanding that she was entitled to be free from punishment because she was a pretrial detainee), and that she was obviously in need of urgent medical diagnosis and treatment—and the need was so obvious that a layperson would have easily recognized the necessity for medical attention—yet they failed and refused to monitor, evaluate, examine or treat Lisa and failed and refused to

provide or arrange for a competent medical professional to monitor, evaluate, diagnose, examine, or provide medical care for Lisa. At about 6 p.m. on April 1, 2016, a detainee ("D1"), who had earlier heard Lisa moaning loudly and calling out for help, left her cell on the upper tier of 8C after dinner lock-down and walked down to the lower tier to Lisa's cell because she knew that whoever was there was obviously suffering tremendously. Unlike the uncaring, callous Guard Defendants and Nurse Defendants, D1 was extremely concerned about Lisa because it was obvious even to a layperson that Lisa's severe medical condition required medical treatment, yet nothing was being done for Lisa by the Guard Defendants or the Nurse Defendants.

28.    D1 looked into Lisa's cell, which was visible through large windows, and saw Lisa sitting on the bunk, "crunching" back and forth, all the way up and all the way down, curling up into a ball, demonstrating that Lisa was in obviously serious pain and distress, requiring immediate medical attention. D1 could see that Lisa was obviously extremely sick and in horrendous pain, yet nothing was being done by the Guard Defendants or the Nurse Defendants to medically assist, or arrange medical assistance for, Lisa.

29.    D1 believed that Lisa was going to die because of her horrifying bodily movements, her obliviousness to everything else around her as she was writhing in

pain, and her earlier loud moans and calling out for help. D1 stared at the camera near Lisa's cell, stared at the control desk, where Defendant Booth was located, and stared at Lisa's cell, to make it clear to everyone that she could tell that Lisa was extremely sick and in need of medical assistance, but being completely ignored by the Guard Defendants and the Nurse Defendants.

30.    At that point, D1 asked Defendant Booth if he was going to "call medical" and stated to Booth that the girl in Lisa's cell (D1 did not know Lisa's name at that point) was in urgent need of medical attention. Booth responded, rudely, sarcastically, and dismissively, as if D1 was bothering him, that "We're watching her. She's just coming down off of drugs."

31.    Defendant Booth then went to Lisa's cell, opened the door, and said, facetiously, with a sneer on his face, "I'll bet it feels like you're going to die, doesn't it? Just a couple more days." Booth then slammed the door hard and walked away, again without arranging for anyone to provide medical assistance for Lisa, whose need for medical treatment was obvious, and would have been obvious, to any reasonable layperson.

32.    Lisa did indeed feel like she was going to die, as cruelly and sarcastically suggested by Defendant Booth—and she did die because of the cruel,

dismissive, deliberate indifference of Booth, the other Guard Defendants, and the Nurse Defendants.

33.     As one detainee ("D2") who was in 8C has stated: "I can recall when Lisa came into the unit. She looked very frail. As I would serve meals we would take note of what women would not eat. Lisa did not eat. I remember trying to serve her one afternoon. She seemed to be in a lot of pain. Not being sure of her situation I asked her if she would try to eat something. She kept holding her stomach and crying out for help. I recall when Officer Booth was on duty she [Lisa] was at the door asking for help. Her voice was low and not very audible. He just waved at her from the officers station." D2 continued: "I would explain to the officer [Defendant Booth] that clearly she [Lisa] needed medical attention." D2 also notes: "I repeated to the housing officer if she [Lisa] didn't get medical attention she was going to die."

34.     At about 10 p.m. or later on April 1, 2016, D1, from her cell, heard very loud yelling and moaning from Lisa and it seemed obvious to her that Lisa must be dying and that nothing was being done for her. D1 heard repeated beeping from a button ("alarm button") provided to detainees in their cells for use if they needed to call for help. She then heard over a speaker someone asking, "Is that girl ok? Does she need medical attention?"

35.     Defendant Harris, outrageously and callously indifferent to Lisa's obvious need for urgent medical attention, responded that no, she (Lisa) did not need medical attention. Defendant John Doe came to 8C anyway and Harris asked him what he was doing there. Lisa exclaimed, "I can't see." That signified a real possibility of a significant change in consciousness and worsening medical condition that should have led John Doe to either evaluate Lisa or arrange for her to be evaluated and treated by someone who was competent to do so. However, Defendant John Doe responded with callous and deliberate indifference to Lisa's severe sickness, pain, and suffering, accusing Lisa of manipulating the staff to get a free pair of glasses. He said there was no reason for him to come, in the middle of the night, to the area where Lisa's cell was located so she could get a free pair of glasses. Lisa responded by emphasizing that she could not see and she needed to get to a hospital.

36.     At that point, Defendant Harris, callously and astoundingly indifferent to Lisa's life-threatening illness and extreme pain, which was obvious to anyone seeing or hearing her and for which the need for immediate medical attention was obvious to anyone seeing or hearing her, complained that staff at the Salt Lake County Metro Jail do not even get optical insurance. Defendant Harris did nothing whatsoever to obtain medical help for Lisa, although it was obvious to any

layperson, and was obvious to detainees in 8C, she was in dire need of it. Defendant John Doe, instead of providing, or arranging for, medical assistance to Lisa, simply said he was not going to help her and that he was going to write her up for continuing to request medical treatment.

37.     Throughout the night of April 1 and early morning of April 2, 2016, Lisa repeatedly pushed her alarm button, the beeping from which could be heard throughout 8C. Lisa had earlier been instructed to press the alarm button to obtain medical treatment for her documented "multiple medical issues." Defendant Harris ordered Lisa to stop pushing the alarm button, assuring her that she could "get medical" in the morning, which Defendant Harris failed to ever arrange.

38.     During that same night and early morning, Lisa continued seeking help, and Defendant Harris was heard at one point saying to her that she would not even talk to Lisa and that she was going to write her up for continuing to push the alarm button. During the entire evening and early morning, Harris failed and refused to provide or obtain timely and proper monitoring, evaluation, medical care and treatment for Lisa, which failure and refusal constituted deliberate indifference to Lisa's serious medical needs and constitutional right to receive medical care for her serious medical condition while incarcerated in the Salt Lake County Metro Jail.

39.     Between 4 a.m. and 6 a.m., Lisa was again heard crying out, obviously miserable in her pain and suffering and seeking help. At one point, Lisa was so desperate to get out of her cell, where she was still locked down, that she tried to get her arm and body through the cuff-port in her cell door. Lisa was, and had been, out of her mind in pain, confusion, sickness, and desperation—all of which was obvious to anyone caring to pay attention, and which was obvious to other detainees, but which was deliberately and entirely ignored by the indifferent, uncaring, mean-spirited, and callous Guard Defendants and Nurse Defendants.

40.     Between 6 a.m. and 8 a.m. on April 2, 2016, Lisa cried out loudly, obviously extremely sick and begging for help, leading D1 to believe she was listening to someone dying then and there. None of the Defendants paid any attention to Lisa; none of them provided any monitoring, evaluation, medical care or treatment for her; and none of them arranged for any monitoring, evaluation, medical care or treatment for her, notwithstanding the obvious need for immediate medical attention.

41.     Around 7:30 a.m. on April 2, Defendant James entered 8C. Defendant James was responsible for being a gatekeeper for other medical personnel capable of treating Lisa's condition and consistently and outrageously failed and refused to fulfill his gatekeeper role when there was such an obvious need for treatment or referral to diagnose, monitor, and treat the life-threatening illness, pain, and

suffering experienced by Lisa. Defendant James left 8C shortly after 7:30 a.m., then came in again about 7:45 a.m. and pointed to Lisa's cell. However, he did not speak with Lisa, he did not check on or monitor her, and he did nothing to obtain medical assistance for her or to determine if she required medical assistance and, if so, the urgency of obtaining the assistance. As Defendant James was about to leave 8C again, D1 yelled out through a crack in the side of her door to James, asking him if he was not even going to check Lisa's blood pressure and stating that people had said Lisa would "get medical" that morning. D1, who recognized that Lisa's severe medical condition obviously required immediate medical attention, adamantly insisted that Defendant James check Lisa's blood pressure. Defendant James simply responded by saying that Lisa was "fine" and failed and refused even to cursorily examine, monitor, or speak with Lisa or to obtain monitoring, evaluation, or medical care for her from someone competent to diagnose and treat her.

42.    At about 8 a.m. on April 2, Defendant Fredrickson walked along cells on both tiers in 8C. When he arrived at D1's cell, she spoke to him through the door, asking him if he had checked on "that girl" and that she [Lisa] needed "medical". Fredrickson's appalling response was that he had just checked on Lisa and that she was "fine"—then he said, "If she dies it will be your fault," laughing as if it were all a joke. Then he added, "Well, she's not going to die on my watch." As it turned out,

Lisa had virtually died at that point. D1 walked to Lisa's cell, where Lisa was still locked in, looked into Lisa's window, and saw her body on the floor, leaned against the bunk, with her head all the way back, mouth open, and her eyes open. D1 yelled at Defendant Fredrickson, "She's not breathing. . . .You said you just checked her!"

43.  Lisa was found in full cardiac and respiratory arrest, CPR was administered, and Lisa was finally transported to a hospital by an ambulance, but it was too late. Lisa was pronounced dead at 1:14 a.m. on April 3, 2016.

44.  From the time Lisa was found unresponsive in her cell until she was pronounced dead, she never regained consciousness. Because of the absence of monitoring and charting by the Guard Defendants and Nurse Defendants, and because no one from the Salt Lake County Metro Jail informed medical personnel at the hospital of Lisa's obvious symptoms of abdominal pain, the physicians and nurses at the hospital were deprived of vital information that should have been made available to them about Lisa's severe abdominal pain, as well as all other information relevant to her medical condition that was, or should have been, available from Nurse Defendants and Guard Defendants, and which adequate policies, procedures, practices, custom, training, and supervision would  have caused to be available.

45.  Lisa's death would have been prevented if any of the Guard Defendants or Nurse Defendants had called for qualified medical assistance or if Nurse

Defendants had even provided the most preliminary diagnostic evaluation procedures, such as checking Lisa's blood pressure, temperature, or pulse, and then taken the obviously necessary steps that would have led to Lisa being further examined and treated. Lisa's blood pressure was never checked the entire time she was in 8C, despite her many cries for help and despite the adamant demands of at least one other detainee that Lisa's blood pressure be checked.

46.     Because of the Defendants' failures to respond to Lisa's obvious life-threatening medical condition, she died from the effects of peritonitis, which is life-threatening if not treated and causes extreme pain and suffering, as well as dehydration, before death. According to the Medical Examiner, Lisa "died as a result of peritonitis due to gastrointestinal perforation at the anastomosis site of a remote gastric bypass. The decedent's medical history is significant for Crohn's disease which may have been a contributing factor to the perforation."

47.     Other complications of peritonitis are dehydration and loss of appetite. Had the Guard Defendants or Nurse Defendants arranged for a competent medical professional to evaluate Lisa, such a medical professional would have recognized the symptoms exhibited by Lisa as being life-threatening and requiring immediate medical attention.

48.     Lisa's temperature right after she had been taken from the Salt Lake County Metro Jail was 93.6 degrees Fahrenheit, which was extremely low and could easily have been determined had she been provided any semblance of medical diagnosis or treatment while under the control and experiencing the extraordinary neglect and deliberate indifference of the Guard Defendants and the Nurse Defendants at the Salt Lake County Metro Jail.

49.     Hours and days before Lisa's death, Lisa's medical history, her history of not eating for days before her death, her dehydration (which could easily have been checked and ascertained), her severe, obvious abdominal pain, and other symptoms would have caused any competent medical professional who evaluated her to recognize that, whatever she was suffering from, she needed emergency medical diagnosis and treatment, which would have saved Lisa's life and prevented her from experiencing the incomprehensible agony she suffered before her death.

50.     In light of the patent seriousness of Lisa's severe medical condition, which was obvious to all—upon seeing her and upon hearing her—which Lisa repeatedly validated by her many desperate complaints of pain and misery, (1) the failures and refusals of the Guard Defendants to monitor or arrange for monitoring, evaluation, medical diagnosis, medical care and treatment and (2) the failures and refusals of the Nurse Defendants to monitor, diagnose, evaluate, and treat, or to

20

arrange for monitoring, evaluation, diagnosis and medical care and treatment by a medical professional competent to recognize and treat Lisa's deadly peritonitis, each constituted outrageous and deliberate indifference to Lisa's urgent and critical medical condition.

51.     The failures and refusals by the Nurse Defendants to (1) provide medically necessary monitoring, evaluation, diagnosis, and medical care and treatment for Lisa, (2) notify a physician of Lisa's serious medical condition, or (3) arrange for such monitoring, evaluation, diagnosis, or medical care and treatment by a medical professional competent to diagnose and treat Lisa, constituted deliberate indifference insofar as they had a responsibility to serve as a gatekeeper for other medical personnel capable of treating Lisa's condition, yet failed and refused to fulfill that gatekeeper role in the face of the obvious need for treatment or referral for Lisa while she was obviously suffering a deadly medical emergency with attendant obvious and extreme pain and suffering.

52.     Such failures and refusals by the Nurse Defendants to provide, or arrange for, medically necessary diagnosis and treatment for Lisa constituted an extraordinary degree of neglect insofar as (1) they recognized their inability to treat Lisa due to the seriousness of her condition and their lack of expertise, but refused and failed to obtain medical help for Lisa; (2) they failed to treat, or obtain treatment

for, Lisa's extreme abdominal pain and suffering, the existence and severity of which medical condition was so obvious that even a layperson would, and laywomen detainees did, recognize the condition and its deadly seriousness; and (3) they entirely denied monitoring, evaluation, medical care and treatment although they were presented with recognizable symptoms which created and obviously signified a severe medical emergency. The Nurse Defendants completely refused to fulfill their duty as medical gatekeepers when they observed obvious signs of Lisa's medical emergency, but neither treated nor summoned medical assistance despite Lisa's and others' pleas that Lisa receive medical attention.  The Nurse Defendants chose to provide no treatment for Lisa rather than treatment or referral for treatment that professional judgment dictated.

53.    Defendants Winder, Lofgreen, and Wilcox were supervising officials at the Salt Lake County Metro Jail, responsible for assuring that detainees received necessary medical services and, as such, each of them is liable for violation of Lisa's constitutional rights to be free from the deliberate disregard of her serious medical condition and from unnecessarily rigorous treatment.  Those Defendants had the power and duty to alleviate the conditions which led to the constitutional violations suffered by Lisa, but they failed and refused to alleviate the conditions.

54.     As high-ranking officials and administrators of the Salt Lake County Metro Jail, Defendants Winder, Lofgreen, and Wilcox had a constitutional duty to provide necessary medical treatment to inmates. Those Defendants failed to remedy serious incompetence and serious deficiencies in the health care system at the Salt Lake County Metro Jail, including deficiencies in staffing, facilities, and procedures, that prevented the diagnosis and treatment of Lisa.

55.     At all times material hereto, Defendants Winder, Lofgreen, Wilcox, and Salt Lake County followed, established, and implemented a policy or custom of failing to train or adequately supervise its officers, agents, or employees who they assigned to work, and who they were responsible for supervising, at the Salt Lake County Metro Jail. The policies and customs of Defendants Winder, Lofgreen, Wilcox, and Salt Lake County constituted and reflected deliberate indifference to the serious medical needs and constitutional right of Lisa to receive proper and necessary medical care for her obviously serious, life-threatening medical condition while detained in the Salt Lake County Metro Jail. Those policies and customs also led to the infliction of punishment on Lisa, including the disregard of her serious medical condition and locking her down and refusing medical observation, with the intent to make her withdraw from drugs cold-turkey (when drug withdrawal is itself a serious medical condition), without any medical observation, evaluation, or

treatment, in violation of her due process rights under the United States and Utah Constitutions.

56.     Defendants Winder, Lofgreen, Wilcox, and Salt Lake County caused Lisa to be denied medical treatment for her serious medical condition insofar as they developed, adopted, implemented, and administered policies or customs that (1) denied nurses or other jail personnel the ability or authority to obtain a physician's care for detainees; (2) permitted nurses or other jail personnel to conceal the existence of serious physical ailments from physicians; (3) depended on the ability of nurses to recognize and treat serious physical ailments; (4) enabled nurses to fail or refuse to provide medical care and to prevent detainees from receiving medical treatment from physicians; (5) created excessive delays in the provision of medical treatment by physicians; (6) permitted prison medical personnel to provide improper or inadequate treatment to seriously ill detainees; (7) permitted prison personnel to improperly or inadequately make, or fail to make, referrals for treatment by competent medical professionals to seriously ill detainees; and (8) failed to provide for or effectuate competent and responsive medical treatment for detainees.

57.     The policies and customs developed, adopted, implemented, and administered by Defendants Winder, Lofgreen, Wilcox, and Salt Lake County denied Lisa and other inmates access to necessary medical care and demonstrate

24

deliberate indifference to Lisa's and other inmates' serious medical needs in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

58.     The presence of gross deficiencies in the medical care system at the Salt Lake County Metro Jail, which led to the failures to provide or to obtain from a competent medical provider medical treatment and care of Lisa's severe, life-threatening medical condition, and the failure of Winder, Lofgreen, Wilcox, and Salt Lake County to remedy those deficiencies, demonstrated disregard for a known or obvious risk that was very likely to result in the violation of the constitutional rights of Lisa and other pretrial detainees and convicted inmates held at the Salt Lake County Metro Jail. Consequently, those failures evidence deliberate indifference to Lisa's and others' serious medical needs by Winder, Lofgreen, Wilcox, and Salt Lake County. Indicative of the culture, policies, procedures, and customs permitted and perpetuated by Winder, Lofgreen, Wilcox, and  Salt Lake County, which led to the grossly deficient medical care system at the Salt Lake County Jail, Carlos Umana, a mentally ill inmate, was allowed to die of starvation and dehydration after spending four months in custody at the Salt Lake County Metro Jail; Alexa Hamme, 25 years old, was found unresponsive in her cell at the Salt Lake County Metro Jail and died after the  failure to attend to her serious medical needs; Lindsey Goggin died as a result of severe dehydration while being held at the Salt Lake County Metro

Jail; and Dustin Bliss was found unresponsive in a holding cell in the booking area of the Salt Lake County Metro Jail and died, never having received adequate medical treatment at the Salt Lake County Metro Jail. The deaths of detainees at the Salt Lake County Metro Jail have contributed to Utah having the highest rate of county inmate deaths per capita in the latest year full statistics are available, with at least eleven inmates dying in county jails in 2015 and twenty-three in 2016.

59.     As a direct and proximate result of the wrongful conduct and deliberate indifference of the Defendants, (1) Lisa consciously suffered severe and excruciating physical, emotional, and mental pain prior to her death; (2) Lisa's emergency medical condition, which could have been successfully treated had Defendants not been deliberately indifferent to her serious medical needs, and the pain and suffering she endured as a result of it, became far worse, leading to her premature death and her loss of the enjoyment of life and of the love, affection, and consortium of her parents and children and being able to enjoy the delight and pleasure of parenting her beloved children; (3) medical, funeral, and cremation expenses for Lisa were incurred; (4) Lisa and her Estate lost substantial earnings based on the probable duration of Lisa's life had her serious medical condition been appropriately and constitutionally addressed and treated; and (5) Lisa and her Estate suffered other damages recognized at law, for which Defendants are liable to Plaintiff Calvin

Donald Ostler, as personal representative of the Estate of Lisa Marie Ostler, for the benefit of Lisa's heirs, in an amount that shall be proven at trial.

60.     Prior to her death, Lisa was a loving mother to C.K., E.L.K., and L.M.O. and a loving daughter of Plaintiffs Cal and Kim and was a source of companionship, joy, happiness, service, love, affection, guidance, and counsel to her parents and children, who have now sustained substantial damages for her wrongful death. As a direct and proximate result of the wrongful conduct and deliberate indifference of the Defendants, the minor surviving children of Lisa—C.K., E.L.K., and L.M.O.—have been deprived of their inheritance and financial support, the companionship, joy, happiness, service, love, affection, guidance and counsel that would have been enjoyed by them had Lisa not died as a result of the extraordinary neglect and deliberate indifference of Defendants, by reason of which Plaintiffs are entitled to receive from Defendants damages in an amount that will be proven at trial. Cognizant of the holding of *Berry v. City of Muskogee*, 900 F.2d 1489 (10th Cir. 1990), Plaintiffs respectfully submit that the award of such damages to the surviving parents and children of Lisa, in the nature of a wrongful death action, is necessary and appropriate to fulfill the remedial and deterrence purposes of 28 U.S.C. § 1983.

61.     Plaintiffs, and each of them, are entitled to recover from and against the Defendants, jointly and severally, all damages sustained as a result of the Defendants' wrongful conduct and deliberate indifference, including but not limited to the damages described above and, in addition, all reasonable attorneys' fees and costs incurred in this action, pursuant to 42 U.S.C. §§ 1983 and 1988.

62.     Plaintiffs are further entitled to recover from and against the Defendants, except Salt Lake County, punitive damages, in an amount determined at trial, for the Defendants' willful, wanton, deliberate, reckless, and callous indifference toward Lisa's federally protected rights, which proximately caused the extreme, worsening, excruciating pain and suffering experienced by Lisa and to her tragic and unnecessary death.

63.     Plaintiffs are further entitled to recover from and against the Defendants, except Salt Lake County, punitive damages, in an amount determined at trial, for the Defendants' willful, wanton, deliberate, reckless, and callous indifference toward Lisa's federally protected rights, which proximately caused the extreme, worsening, excruciating pain and suffering experienced by Lisa and to her tragic and unnecessary death.

## SECOND CLAIM FOR RELIEF
### (Violations of the Utah Constitution, Article I, Sections 7 and 9)

For their Second Claim for Relief, Plaintiffs complain against the Defendants and allege as follows:

64.     Plaintiffs repeat and incorporate by this reference the allegations set forth in paragraphs 1 through 63 above.

65.     By their acts and omissions, as described above, Defendants deprived Lisa of her rights guaranteed by Article I, Section 7 of the Utah Constitution, which provides that "[n]o person shall be deprived of life, liberty or property, without due process of law," including their deliberately indifferent treatment of, and failure to treat, Lisa and their punishment of Lisa.

66.     By their acts and omissions, as described above, Defendants deprived Lisa of her rights guaranteed by Article I, Section 9 of the Utah Constitution, which provides that "[p]ersons arrested or imprisoned shall not be treated with unnecessary rigor."

67.     The only remedy for these violations of the Utah Constitution is under the common law, and because of the repugnance of Defendants' conduct and omissions and the strong interests of the State of Utah in discouraging similar future conduct and omissions, no special factors counsel hesitation by this Court in

providing or fashioning an appropriate remedy for the violations of Lisa's State constitutional rights in this case.

68.    Lisa suffered flagrant violations by Defendants of her clearly established constitutional rights.

69.    No existing remedies redress Lisa's pain, suffering, and unnecessary death. That is particularly true where different standards apply under the Due Process Clauses of the Federal Constitution and the Unnecessary Rigor Clause of the Utah Constitution. Further, no existing remedies redress the losses sustained by Lisa's parents and three minor children as a result of Defendants' unconstitutional conduct and omissions.

70.    Equitable relief, such as an injunction, was and is wholly inadequate to protect Lisa's rights or redress her pain, suffering, and unnecessary death or the losses sustained by Lisa's parents and three minor children as a result of Defendants' unconstitutional conduct and omissions.

71.    The Guard Defendants and the Nurse Defendants intentionally denied and delayed access to medical treatment for Lisa, resulting in her extreme pain, suffering, and death.

72.    The conduct and omissions of the Defendants toward Lisa were an abuse to the extent that they cannot be justified by necessity and were needlessly harsh, degrading, and dehumanizing treatment of Lisa.

73.    The conduct and omissions of the Guard Defendants and Nurse Defendants toward Lisa, and their ability to engage in such conduct and omissions under the constitutionally deficient policies, customs, and supervision of Defendants Winder, Lofgreen, Wilcox, and Salt Lake County, was treatment that was clearly deficient and unjustified, constituting unnecessarily rigorous treatment of Lisa in violation of Article I, section 9 of the Utah Constitution.

74.    As a direct and proximate result of the wrongful conduct, the deliberate indifference, and unnecessarily rigorous treatment by the Defendants, (1) Lisa consciously suffered severe and excruciating physical, emotional, and mental pain prior to her death; (2) Lisa's emergency medical condition, and the pain and suffering she endured as a result of it, became far worse, leading to her premature death and her loss of the enjoyment of life and of the love, affection, and consortium of her parents and children and being able to enjoy the delight and pleasure of parenting her beloved children; (3) medical, funeral, and cremation expenses for Lisa were incurred; (4) Lisa and her Estate lost substantial earnings based on the probable duration of Lisa's life had her serious medical condition been appropriately

31

and constitutionally addressed and treated; and (5) Lisa and her Estate suffered other damages recognized at law, for which Defendants are liable to Plaintiff Calvin Donald Ostler, as personal representative of the Estate of Lisa Marie Ostler, for the benefit of Lisa's heirs, in an amount that shall be proven at trial.

75.    Prior to her death, Lisa was a loving mother to C.K., E.L.K., and L.M.O. and a loving daughter of Plaintiffs Cal and Kim and was a source of companionship, joy, happiness, service, love, affection, guidance, and counsel to her parents and children, who have now sustained substantial damages for her wrongful death. As a direct and proximate result of the wrongful conduct, deliberate indifference, and unnecessarily rigorous treatment of Lisa by the Defendants, the minor surviving children of Lisa—C.K., E.L.K., and L.M.O.—have been deprived of their inheritance and financial support, the companionship, joy, happiness, service, love, affection, guidance and counsel that would have been enjoyed by them had Lisa not died as a result of the extraordinary neglect, deliberate indifference, and unnecessarily rigorous treatment of Defendants, by reason of which Plaintiffs are entitled to receive from Defendants damages in an amount that will be proven at trial.

76.    Plaintiffs are entitled to recover from and against the Defendants, jointly and severally, all damages sustained as a result of the Defendants' wrongful

conduct and deliberate indifference, including but not limited to the damages described above and, in addition, all reasonable attorneys' fees and costs incurred in this action, pursuant to Utah Code Ann. § 78B-3-104(3).

77.     Plaintiffs are further entitled to recover from and against the Defendants, except Salt Lake County, punitive damages, in an amount determined at trial, for the Defendants' willful, wanton, deliberate, reckless, and callous indifference and disregard toward Lisa's constitutionally protected rights, which proximately caused the extreme, worsening, excruciating pain and suffering experienced by Lisa and to her tragic and unnecessary death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief on their claims for relief against Defendants as follows:

Under their First Claim for Relief, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

1.     For an award of compensatory damages, the amount of which will be established at trial, with pre-judgment interest on all special damages.

2.     For an award of punitive damages against all Defendants, except Salt Lake County, in an amount to be established at trial;

3.      For an award of reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988; and

4.      For such other and further relief as the Court deems proper.

Under their Second Claim for Relief, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

1.      For an award of compensatory damages, the amount of which will be established at trial, with pre-judgment interest on all special damages.

2.      For an award of punitive damages against all Defendants, except Salt Lake County, in an amount to be established at trial;

3.      For an award of reasonable attorneys' fees and costs, pursuant to Utah Code Ann. § 78B-3-104(3); and

4.      For such other and further relief as the Court deems proper.

## DEMAND FOR JURY

Plaintiffs hereby demand a trial by jury on all their claims and have submitted the jury fee.

DATED this 22nd day of March, 2018.

LAW OFFICES OF ROCKY ANDERSON

/s/ Ross C. Anderson
Ross C. Anderson
Attorney for Plaintiffs

34

<u>Plaintiffs' Address</u>:
1094 W. Greasewood Drive
Riverton, Utah  84065